# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

## Schroyer *against* Lynch.

A postmaster, though answerable for want of attention to the official conduct of his subordinates, is not responsible for their secret delinquencies; and an action, therefore, lies not against him for the purloining of a letter by a sworn assistant, appointed and retained by him in good faith.

THE plaintiff brought an action on the case, in the district court of Allegheny county, against the defendant, as postmaster of the office in Pittsburg, for the loss of a letter containing 650 dollars in bank notes, put into the office by his agent in Shanesville, Ohio, and directed to him at New Berlin, Pennsylvania. The declaration contained averments that the letter was mailed at the office in Shanesville, and received for distribution at the office in Pittsburg, by the regular course of the mail; and that it was the defendant's duty to have caused it to be mailed again for the distributing office in Chambersburg. "Nevertheless, the said David Lynch did not so as aforesaid, then or there as last aforesaid, nor ever afterwards, reput up, remail, and deliver to be carried as aforesaid, the said packet, consisting of the said letter and the notes inclosed, so as aforesaid the property of the said Christian Schroyer; but on the contrary thereof, wholly neglected and refused so to do: by reason

VIII.—2 o

[Schroyer v. Lynch.]

whereof," &c.   Nothing appeared in the evidence to rebut the presumption that the letter had reached the office in Pittsburg; and it was pretty well ascertained that it had been purloined there by an assistant subsequently discharged for embezzling the post-office funds. Instead of negligence, the proof was of diligence and proper attention by the defendant to the official conduct of the subordinates, though it was proved that the delinquent had previously been guilty of opening a letter to a pensioner—a fact that had been concealed from the defendant.   It was proved, also, that the assistants are paid by the department; that they take an oath prescribed by congress; and that their names are registered in the books of the general post-office at Washington.   Under a direction that if the defendant had faithfully discharged his own peculiar duties as head of the office, there could not, on the pleadings, be a verdict against him for the misconduct of his assistant, the jury found for him, and the plaintiff excepted.

*Knox* and *Foster*, for plaintiff in error, cited 1 *L. Raym.* 646; *Cowp.* 756; 1 *Johns. Rep.* 396; 7 *Cranch* 242; *Story on Bailment* 302.

*M'Candless* and *Vanamridge*, for defendant in error, cited 1 *Bell's Law of Scotland* 468; 2 *Wils.* 454; *Bailey on Agency* 227; 2 *Kent* 610; 2 *Mass. Rep.* 378.

The opinion of the Court was delivered by

KENNEDY, J.—This action, it must be observed, is not against the postmaster-general, but against a deputy, appointed by him to attend to the discharge of the duties appertaining to the post-office located and kept in the city of Pittsburg.   Deputy postmasters have nothing to do with the carrying of the mail, by means of which letters, packets, &c., are conveyed and transmitted throughout the Union.   The carriers of the mails are not employed by them; nor have they any authority or control whatever over the carriers.   The duty of a deputy postmaster is confined to the receiving of letters, packets, &c., brought to his office, and the delivering of such of them as are not to be transported further, to the persons respectively to whom they are addressed, when called for; and after putting such as are to be carried further into the proper mails, in order that they may reach the places and persons to which and to whom they are respectively directed, to the delivering of the mails containing the same to the persons appointed and duly authorised to receive and carry them.   The business, therefore, of the deputy postmaster would not seem to partake of the nature of a common carrier, but of a wharfinger or warehouse man.   Wharfingers and warehouse men, however, though to be paid for their care and attention in keeping the goods safely, are only responsible, like other interested bailees, for *ordinary* negligence; and consequently are not liable for

[Schroyer v. Lynch.]

losses arising from accident, where they are in no default. *Jones on Bailment* 97; *Story on Bailment* 289, sects. 444. 451, 452; Cailiff *v.* Danairs, *Peake N. P. C.* 114; Finucane *v.* Small, 1 *Esp. N. P. C.* 315; Roberts *v.* Turner, 12 *Johns. Rep.* 232; Platt *v.* Hibbard, 7 *Cowen* 497; 2 *Wend.* 593. And in Garside *v.* The Proprietors of the Trent and Mersey Navigation, 4 *Term Rep.* 581, a common carrier, from Stourpoint to Manchester, undertook to carry goods from the former to the latter place, and to forward them from thence to Stockport. Upon his arrival at Manchester, there being no carrier there to take the goods on to Stockport, he deposited them in his own warehouse, until there should be an opportunity of sending them forward by the Stockport carrier. No distinct price was to be charged for the goods while they were in the warehouse at Manchester, nor would they have been deposited there if the Stockport carrier had been ready to receive them upon their arrival at that place. The goods, while they remained in the warehouse, and before they could be forwarded in the usual way, were destroyed by an accidental fire. The carrier was holden not to be liable for the loss, because his duty as a carrier having terminated, the depositing the goods in his warehouse invested him only with the character of a warehouse man, and in that capacity he would not be made responsible for an injury which did not arise from any want of ordinary diligence on his part; or, in other words, the loss was not occasioned by his ordinary negligence. A stronger and more apt case, perhaps, could not happen to show the settled difference of responsibility between a carrier and a warehouse man. It shows that, notwithstanding the same person be invested with both characters in regard to the same goods, yet the liability of the one must not be confounded with that of the other. The warehouse man receives goods into his warehouse to be delivered by him to a carrier, in order that they may be transported to their place of destination; but, having nothing to do with the carrying of them, he cannot be made responsible for the loss or damage of them as a carrier. In like manner the deputy postmaster receives letters, packets, &c., into his office, either to be delivered by him at his office to the persons to whom they are respectively directed, or to the proper carrier of the mail, that they may be forwarded according to their direction; but he neither carries them nor in any way undertakes for doing so. And seeing he has neither the appointment nor the control of those who do carry the mails, it would seem, therefore, impossible that he should be made liable as a common carrier; or for any losses or injuries, saving those arising from ordinary neglect on his part. Ordinary neglect, when he has no assistant to attend to and perform the duties of the office, may consist in his not attending to the performance of the same himself in person with reasonable vigilance and care; or, where he has assistants, in his not exercising that care and diligence towards them in the performance of the duties assigned to them, which every person

of common prudence and capable of governing a family takes of his own concerns; and for every loss occasioned by the negligence of the deputy postmaster in this respect, I apprehend, that he would be held responsible, though the loss should be produced *immediately* by an *accident* or a *force* that could not be avoided or resisted. *Jones on Bailment* 118, 122. Beyond this, however, as I conceive, the responsibility of a deputy postmaster does not extend. If his assistants were, properly and strictly speaking, his servants, it might be that their neglect or default ought to be imputed to him as his own neglect, so far as to render him civilly answerable for it. But they cannot be considered his servants either in the common or legal acceptation of the term. Though employed by him, it is only with the approbation of the postmaster-general that he can do so; nor can he retain any one in his office as an assistant contrary to the will and pleasure of the postmaster-general. And besides, before these assistants enter upon their employment, they have to take an oath or affirmation prescribed by law; and are paid for their services, not by the deputy postmaster, but by the government, as every officer of it is; so that, instead of being servants of the deputy postmasters, they must be regarded as officers, *sub modo* at least, of the government. The assistants of a deputy postmaster do not appear to stand in greater subserviency, or in a more servile character to him than he does himself to the postmaster-general, and yet in Lane *v.* Cotton, 2 *Ld Raym.* 646, it was decided, by three judges against Lord Holt, that the postmaster-general was not liable for the loss of a letter containing exchequer bills, by the negligence of his deputies. And afterwards in Whitfield *v.* Despencer, *Cowp.* 754, where the same question, after being very elaborately discussed before Lord Mansfield and his associates, was decided unanimously by them in the same way. The ground of these decisions seems to be that the post-office establishment is to be considered as an engine of the government, created by act of parliament for the purposes of revenue and police; and that the persons employed therein, being appointed to that end by the government, have no contracts with individuals interested in their services, either express or implied, which would render them liable to the latter for losses occasioned by the negligence of others; or for any losses sustained other than those arising from their own default or neglect of duty. But for losses of this latter description it is clearly settled that each postmaster is liable for his own neglect or delinquency. Browning *v.* Goodchild, 3 *Wilson* 443; Stock *v.* Harris, 3 *Wilson* 449, 454; Whitfield *v.* Le Despenser, *Cowper* 765, per Lord Mansfield; 2 *Kent's Comm.* 610; *Story on Bailment,* 302, *pl.* 463.

The question whether a deputy postmaster is liable for the neglect or default of his clerks or assistants has never, I believe, been settled by a direct adjudication in any of our courts as yet; but from the relation in which they stand to him, as shown above, and from the design and nature of the post-office establishment, it would seem

that he can not be made responsible for them.  It was held merely, in Dunlap *v.* Monroe, 7 *Cranch* 269, without deciding the question of liability, that if it was intended to charge a deputy postmaster with the default or neglect of his assistants, the pleadings must be made up according to the case.  It does not appear, however, in the case before us, that the plaintiff intended, from the manner in which he has drawn his declaration, to charge the defendant on account of the neglect or default of his assistants, unconnected with his own default.  The loss of the plaintiff is alleged to have been occasioned by the delinquency of the defendant himself, in his not attending to the performance of the duties of his office, so as either to perform or cause them to be performed with due care, promptitude and fidelity; and again, in not superintending, with reasonable care and diligence, his assistants while attending to the business of the office.  The court below was therefore right, according to the authority of Dunlap *v.* Monroe, in charging the jury that, " under the pleadings and issue in this case, there could be no recovery against the defendant for any alleged neglect or misconduct of the assistants acting under him, even if it were conceded that such neglect or misconduct were clearly proved."  This, then, disposes of the answer to the defendant's first point, which was excepted to by the counsel for the plaintiff, and assigned here as the first error.

The only remaining error is an exception to the charge of the court, in answer to the defendant's second point, " that the liability of the defendant could result only from his own misconduct, or from his neglect in not properly discharging the duties of his office, and the loss, if any, must result as a consequence from such neglect or misconduct; and that the law did not require that a postmaster should be always personally present in his office, discharging the business thereof in his proper person."  To require a deputy postmaster to be always present in his office ready to perform the duties of it, either in person himself, or to superintend the performance thereof by his assistants, would be unreasonable and at variance with the reason of his being allowed to have assistants.  Assistants are allowed because it would be too onerous, if not wholly impracticable, for the deputy to perform the duties of the office personally himself, or to be at all times personally present when it is requisite that they should be performed.  That every deputy postmaster ought to devote a proper portion of his time, either to the performance of the duties of his office himself in person, or to the superintendence of his assistants while employed in performing the same, is a proposition so evident and reasonable in itself, as not to admit of a doubt; and that he may be made liable for losses occasioned through the want of such personal attention on his part, seems to be equally reasonable and just.  His absence or want of attention may be such as to amount to culpable negligence, by its tendency to tempt spoliations upon his office; and whenever such is made to appear to be the result, he would doubtless be held answerable for

VIII.—2 o*

the loss. The answer of the court below, in every other respect, to this second point of the defendant's counsel, appears to be in accordance with the authority of Dunlap *v.* Monroe, and therefore free from error.

GIBSON, C. J. added:—As it would be preposterous to suppose that an organ of the government can stand, in relation to his office, as a common carrier, the question is, whether the defendant's assistant was his servant; for, as public functionaries are not answerable for the acts of their subordinates, if he was the servant of the public, the last prop which has been thought to support the action is gone. What is there in the case to make him less than an officer? He was employed by the defendant; but to do what? Not the defendant's private business, but a part of his official duty, which could not be done by his own hands, and which the ordinances of the department authorised him to do by the hands of another. That the privity which springs from appointment to office, constitutes the relation of master and servant betwixt the immediate parties, is a principle on which no government has been, or can be, constructed: the man is the servant of the party that pays him. The post-office is a department of the government; and the principle would be as applicable to its principal head, as it would be to the head of a branch of it; yet though urged by counsel, it was disregarded in Lane *v.* Cotton, and Whitfield *v.* Lord Le Despencer —authorities which have long settled the question in England, and which ought, in equal circumstances, to settle it here. What is the condition of a postmaster's assistant as described by Lord Mansfield? "The superior has the appointment of the inferior officers; but they give *security* to the *crown.* One requisite is, that they shall *take the oath* taken by all *public officers.* Another strong guard is, that they are made subject to heavy penalties; and this is carried so far that what, in the case of a common carrier, or any other person, would be only *a breach of trust,* is in *them* declared to be a *capital felony.*" How inconsiderable the difference here! In that instance, the action was against the postmaster-general, and in this it is against a postmaster, his subordinate, who stands, however, in regard to the nomination of his own subordinates, as the postmaster-general does in England. The principle of that case, therefore, is so far applicable to this, that if the assistants, there, are public officers despite the dependent nature of their tenure, they are necessarily so here. But nomination by the subordinate postmaster, is in fact subject to the approbation and consent of his superior, who, by virtue of his power of general superintendence, requires that the name, age, and length of service be particularly reported to him; and who, being in effect the depository of the appointing power, might, if he pleased, nominate in the first instance. Would his nominee be the postmaster's servant? Again: As in the passage quoted, the assistants, like the other officers attached to the

department, take the oath of office prescribed by the act of congress; and, though none but the letter carriers give security, they would all be bound to give it, did the postmaster-general demand it. His discretionary power in matters of administration, is absolute and unlimited. Finally, they are paid, as in England, out of the funds of the department; and though their delinquencies are not declared to be capital felonies, they are severely punishable by the statute of 1825, as misdemeanors. Thus, every essential circumstance or qualification that is found in connection with the appointment there, is also found in connection with it here; and the same policy which is opposed to an action against the postmaster-general, is also opposed to an action against his substitute. But in addition to these indices of official character, we have a provision still more indicative of it in the statute of 1836: "That assistant postmasters and clerks, regularly employed and engaged in post-offices, shall be exempt from militia duties, and serving on juries, and from every fine or penalty for neglect thereof." Now, to say nothing of the words "assistant postmasters," which of themselves import official character, it would be difficult to point out any other constitutional ground in which the federal government might step between a private servant and the performance of his duties to the government of his state. It is only for its officer, and on the ground of conflicting services, that it can claim an exemption; and there can be no such conflict where the services, which lie at the foundation of the claim, are due, not to the claimant, but to the person of its officer, with whose servant it can have no legitimate concern. On any other ground the statute would .be capricious, unconstitutional, and void. Indeed, a private servant would cease to be so, by the very act which created a particular relation betwixt him and the government. Congress has asserted, for assistant postmasters, the attribute of official character; and how can we say they have it not? For torts committed by them, being retained when they had been found unfaithful, he would doubtless be liable; not, however, on the relation of master and servant, but on the principle which implicates a *malâ fide* keeper of a vicious animal in the mischief done by it.

But had the delinquent been the defendant's servant in the strictest sense, I am not satisfied that the action could have been maintained under any form of pleading. It was a part of the plaintiff's case that his letter had been purloined—a point towards which he directed the whole force of his evidence—and it is an indisputable principle, that a master, though liable for his servant's negligences, is not liable for his wilful wrongs. For the position that it is applicable to a case like the present, though I am less confident of it than of the other, we have the authority of Lord Holt, in Jones *v.* Hart, 2 *Salk.* 441, who states it, though inaccurately, to have been the foundation of the judgment in Lane *v.* Cotton, where it was held, he says, " that case lay against the postmaster, and not

[Schroyer v. Lynch.]

against the servant, unless he stole them (the bills) for then he was a *wrongdoer.*" Now, whatever may be thought of his accuracy as to the actual ground of the decision, there can be no doubt of his accuracy as to the distinctions of the common law, for which he certainly was a great authority. His error in Lane *v.* Cotton was not in his principle, but in his view of the case to which he applied it. That so sharp an eye had not perceived a difference betwixt a postmaster's official assistant and his private servant, is attributable to the novelty of the post-office establishment at the time, and the little progress that had been made in the investigation of its structure. On a nearer approach to it, it is not too much to think he would have concurred with his brethren, that the action could not be supported.

Judgment affirmed.