CIRCUIT COURT.                                         NOVEMBER 19, 1860.

EQUITY.

## THE UNITED STATES *v.* KOCHERSPERGER.

1. The business of private carriers of letters and mailable packets, even on principal mail routes, is lawful, unless legislatively prohibited.

2. The government's monopoly cannot be extended beyond the legislative prohibition merely because the continuance of a specific business which has not been prohibited would reduce the postal earnings of the government, or even frustrate the purposes of its exclusive policy.

3. The constitutional power to establish state roads as post roads, can be executed only by the designation of actual public highways, present or future, for use by carriers of the mail. The existence and continuance of such highways are independent of congressional control. Congress cannot regulate their use or secure their permanence. When they cease to be common public highways of the respective states, they are no longer post roads. While they are post roads, carriers of the mail use them under the same conditions as the respective states have imposed on their own citizens.

4. But the highways of a state, so long as they are open to the common public use of her own citizens, may be used unobstructedly by carriers of the mail, and cannot be used by private carriers of mailable matter in any mode which has been prohibited by Congress.

5. Public streets, intersecting a municipal town, are highways distinguishable specifically from the general public highways of a state beyond the town limits. They are within the sovereign dominion of the state, but not as part of its general public domain, as to which no just government can legislate with a disregard of local rights and interests of inhabitants of the town.

6. A post for the carriage of letters on a mail route is distinguishable from a local post for their collection and carriage within the limits of a mail station.

7. Post routes and post roads distinguished.

8. Post routes and post roads are not synonymous in the postal act of 3d March, 1851, establishing post routes within cities and towns. And as this act contains no prohibition of the business of the private carriage of letters in the streets of a city, such business is not unlawful, and is not made so by the act of 2d March, 1827, which applies only to post roads. It is otherwise as to mailable matter where the streets are used as established post roads between mail stations.

9. The word "places" in the act of 3d March, 1845, construed not to mean points within the limits of a mail station or postal district. Therefore, the business of the defendants was not within the prohibition contained in that act. It was neither a private *post* within the meaning of the act of 1827, nor a private *express* within the act of 1845.

BILL IN EQUITY filed 11th August, 1860, by the United States of America against Charles Kochersperger, Elbert Kochersperger, Hiram Miller, and John M. Riley, of the city of Philadelphia, citizens of the State of Pennsylvania.

## STATEMENT.

The bill sets forth the constitutional right of Congress to establish post offices and post roads; the 3d Section of act of Congress of 2d March, 1827; the 9th Section of act of 3d March, 1845; the 10th Section of act of 3d March, 1847; the 10th Section of Act of 3d March, 1851; an order made and published under alleged authority contained in the act of 1851 by the Postmaster-General, dated 1st August, 1860, declaring all the avenues, streets, roads, etc., within certain wards of said city post roads; and further, the establishment by the government of post offices and post routes in the city of Philadelphia and the regular transportation of the mails therein; that defendants, notwithstanding said order, maintain a post for the conveyance of letters and packets by regular trips within said city for pay, etc.; also that they maintain a private express for the same purpose, and complains of the infringement of the said order and prays that defendants may be restrained by injunction.

DEMURRERS were filed October 1st, 1860.

The question was as to the lawfulness of the Postmaster-General's order.

The defendants, at the time the suit was brought, were engaged as mentioned in the bill, and enjoyed a practical monopoly of their own of the business. It was known as "Blood's Despatch," taking its name from its founder. Their operations covered nearly the whole of the newly-consolidated

city of Philadelphia and had all the appliances of a regular service by post, viz., a central office, corner and intermediate receiving boxes on all the thoroughfares, a full corps of carriers, "foot, post, and horse post," and was in all respects a well-organized and very useful enterprise. It was so much superior to anything the citizens had before enjoyed and so well adapted to their wants that the action of the government towards its suppression was viewed with some anxiety. After the rendition of the following opinion, the controversy was, however, abandoned by the defendants and their enterprise ceased to exist, compensation having been made to them by the government to a certain extent for the capital employed.

The case was argued before GRIER, J., and CADWALADER, J., by *George M. Wharton,* for the United States; *Henry M. Phillips,* for Hiram Miller, and *Robert P. Kane,* for Charles Kochersperger.

The opinion of the Court was delivered by

## CADWALADER, J.

Judge Grier authorizes me to state that he has perused the following opinion carefully, and that he fully concurs in it.

A post, etymologically defined, is a mode of conveying written or unwritten intelligence, to and from appointed stations, at regular intervals, or whenever the performance of such service may properly be required. The modes by which intelligence is transmitted through a post, otherwise than at regular intervals, are usually called expresses. Regular posts no longer transmit unwritten intelligence.

A post road is a public highway, whose use by the post is prescribed or authorized by law. A mail is a portable receptacle in which letters, or packets of written or printed sheets, are conveyed by post to an appointed station.

A post office, according to the primary meaning of the word, is an apartment, or building, at an appointed station, for the local transaction of the business of the mail. No postal station is now maintained without such an office.

No government has ever organized a system of posts without securing to itself, to some extent, a monopoly of the carriage of letters and mailable packets. The policy of such an exclusive system is a subject of legislative, not of judicial, inquiry. But the monopoly of the government is an optional, not an essential, part of its postal system. The mere existence of a postal department of the government is not an establishment of the monopoly. When it is legislatively established, it may include one, or more, without embracing all of the subjects of the government's postal arrangements. The business of private carriers of letters and mailable packets, even on principal mail routes, is lawful, unless legislatively prohibited. A private monopolist, secured by prohibitory legislation, cannot require the suppression of a rival business of competitors who do not infringe the prohibition, merely because the continuance of their business would lessen or destroy the profits of his monopoly. A like rule applies in determining the effect of a government's legislative prohibitions to secure its own postal monopoly. The monopoly cannot be extended beyond the legislative prohibitions merely because the continuance of a specific business which has not been prohibited would reduce the postal earnings of the government, or even frustrate the purposes of its exclusive policy. The remedy, if required, is, in such a case, legislative. These remarks are applicable to the laws which Congress has thought necessary and proper for carrying the constitutional power to establish post offices and post roads into execution.

How far, if either post offices alone, or post roads alone, had been mentioned in the Constitution, the carriage of mailable matter by private persons could have been prohibited by Congress, might, perhaps, under certain heads, have been a question attended with difficulties which do not exist under the Constitution as framed. If the necessity or expediency of a postal monopoly is assumed, the wisdom of expressly mentioning both post offices and post roads in the Constitution must be conceded. Neither subject of the two-fold constitutional power is altogether distinct or independent of the other. But, as the

words of the Constitution should be interpreted, each subject of the power is to be regarded as additional to the other. In the present case, the question is, not how far the constitutional power under either head extends, but how far it has been legislatively carried into execution.

The policy of the postal statutes has been to establish, as post roads, those highways in every prescribed or authorized mail route, which are within the general public domain of the respective states. This has been done by declaring the respective mail routes, post roads, authorizing the Postmaster-General to enter into temporary contracts to extend the line of posts, and making prospectively the roads designated in such contracts post roads. The statutes also make all navigable waters on which steamboats regularly pass, from port to port, post roads, and all completed railroads post routes; and authorize the Postmaster-General to contract for carrying the mail on plank roads and navigable canals, declaring them respectively, for such times and such distances as the mails may be carried on them, post roads. To obstruct or to retard the passage of the mail, or to refuse to it the privilege of a public ferry, is made penal. On such general public highways, natural or artificial, the citizens of each State are, under the Constitution, entitled to all the privileges and immunities of citizens of the several States. The states, in surrendering the powers which they have united in delegating to the general government, had no prudential reasons inducing them to restrict its postal authority over such highways.

But the constitutional power to establish state roads as post roads, can be executed only by the designation of actual public highways, present or future, for use by carriers of the mail. The existence and continuance of such highways are independent of congressional control. Congress cannot regulate their use, or secure their permanence. When they cease to be common public highways of the respective states, they are no longer post roads. While they are post roads, carriers of the mail use them under the same conditions as the respective states have imposed on their own citizens. In a case in the Western

District of this Circuit, the Court was of opinion that the act of Congress making all railroads post routes, applied only to railroads laid out and constructed conformably to the legislation of the respective states. A subsequent act of Congress had enacted that certain roads, including a designated railroad, should "be established as *post roads*," and declared this railroad a *post route*. The road was in a route unauthorized by the legislative charter of the company which constructed it. The Court was of opinion that these acts of Congress had not made it a lawful highway. (Cleveland, P. & A. R. R. Co. *v.* Franklin Canal Co., Pittsb. Leg. Journ. 24 Dec., 1853; see 10 Stat. U. S. 250; 9 Harris, 123.) An act of Congress declaring the Wheeling bridge, as it had been constructed at a particular elevation, an established post road, required steamers navigating the river to adapt the height of their chimneys to this elevation of the bridge. This provision as to steamers, though considered by the Supreme Court a constitutional exercise of the power to regulate commerce between the states, was not sustained as an execution of the power to establish post roads. (18 How. 431.) The post-office law authorizes the Postmaster-General to "direct the route or road, where there are more than one, between places designated by law for a post road," and enacts that the road thus designated "shall be considered the post road." But though there is only one road in a prescribed mail route, he cannot, when the road is, from physical obstructions or want of repair, impassable, adopt measures to render it serviceable. The same law requires him in any such case "to report" the fact "to Congress, with such information as can be obtained to enable Congress to establish some other road instead of it, in the same main direction."

But, the highways of a state, so long as they are open to the common public use of her own citizens, may be used unobstructively by carriers of the mail, and cannot be used by private carriers of mailable matter in any mode which has been prohibited by Congress.

In quoting prohibitory statutes which have created or secured the postal monopoly, their penal provisions, their exemptions

of letters carried by special messengers, or of letters carried in a vessel relating to her cargo, and other such particular exceptions, will not be mentioned.

The post-office law of 1825, § 19, enacts that no stage or other vehicle, which regularly performs trips on a post road, or on a road parallel to it, and no packet boat or other vessel which regularly plies on a water declared a post road, shall convey letters. This enactment had, in the post-office acts of 1794, 1799, and 1810, been combined with a prohibition of private foot or horse posts on post roads. But the act of 1825 repealed all prior postal statutes, without re-enacting this prohibition. The right of establishing such private posts existed, therefore, from its date until an amendatory act of 2d March, 1827, revived the prohibition.

This law of 1827, § 3, enacts that no person other than the Postmaster-General, or his authorized agents, shall set up any foot or horse post for the conveyance of letters and packets upon any post road which is or may be established as such by law.

Increased facilities, afforded by steamers and rail cars, afterwards enabled a private letter carrier, travelling in them as a passenger, to transport packages, containing letters and other mailable matter, as his baggage or as freight. The conveyances which he thus used passed regularly over post roads, and often carried the mails for the post-office department. But they had not been *set up,* and were not *specially* maintained as posts. The means by which he carried on the business were ordinarily designated as *expresses.* The Postmaster-General's annual report of 2d December, 1843, stated that numerous private posts, under the name of expresses, had sprung within a few years into existence, extending themselves over the mail routes between the principal cities and towns, and transporting letters and other mailable matter, for pay, to a great extent. This report had been preceded by opinions of two successive Attorney-Generals, upon the effect of the laws which have been quoted. One of these opinions was particularly upon the question of the liability of carriers of such expresses, under the

existing laws.    (Opin. Atty.-Gen. iv., 159, 276.)    In the years 1843 and 1844, suits upon these laws, for penalties, were prosecuted by the United States in the District Courts for both districts of New York, the Massachusetts District, the Eastern District of Pennsylvania, the Maryland, and perhaps other districts.    The defendants were in some cases the principal carriers, whose conveyances were used.    In other cases the suits were against the carriers of the expresses themselves. Except in Pennsylvania, and in Maryland, the prosecutions were unsuccessful.    The questions, and the points decided in other districts, were very clearly stated in a written opinion of Judge Randall, which was published in the Philadelphia *Ledger* of 9th October, 1844.    It appears, from the Postmaster-General's annual report of 25th November, 1844, that the government had been unable to suppress the private expresses, which were still continued "upon the leading post routes."    In this, and in the former annual report, he recommended legislation by Congress for their suppression.

Sections 9 to 12, inclusive, of an act of 3d March, 1845, were intended for this purpose.    The 9th Section enacts that it shall not be lawful to establish any *private express,* or expresses, for the conveyance, or in any manner to cause to be conveyed, or provide for the conveyance or transportation by regular trips, or at stated periods or intervals, from one city, town, or *other* place, to any other city, town, or place in the United States, between and from and to which cities, towns, or other places the United states *mail* is *regularly* transported under the authority of the post-office department, of any letters, packets, or packages of letters or other matter properly transmittable in the United States mail, except newspapers, pamphlets, magazines, and periodicals.    The 10th Section enacts that it shall not be lawful for any stage coach, railroad car, steamboat, packet boat, or other vehicle or vessel, or any of the owners, managers, servants, or crews of either, which regularly performs trips, at stated periods, on a post route, or between two or more cities, towns, or other places, from one to the other of which the United States mail is regularly conveyed under the

authority of the post-office department, to transport or convey any letter or letters, packet or packages of letters, or other mailable matter, otherwise than in the mail.   The 11th Section makes it penal for the owner of a stage coach, railroad car, steamboat, or other vehicle or vessel, to convey or transport any person acting or employed as a private express for the prohibited conveyance of mailable matter; and the 12th Section imposes a penalty for the transmission of any such matter by any prohibited means, or for the depositing of it for the purpose of being transported by any such means.

· The purpose of these prohibitory statutes was thus to secure to the United States a monoply of the carriage of letters and mailable packets on *mail routes*.

Public streets, intersecting a municipal town, are, as highways, distinguishable, specifically, from the general public highways of a state beyond the town limits.   The streets are indeed, as thoroughfares, general public highways of the state. But, independently of this character of thoroughfares, the streets are specially local highways of the town.   Internal affairs of municipal towns, affecting their local interests alone, are always regulated more or less by their local governments. These governments are administered in subordination to the paramount authority of the government of the state in which the towns are situated.   But, in the legislation of the paramount government affecting local interests of such municipilities, the burdens, necessities, and future welfare of their inhabitants are always to be considered.   In the United States the power of uncontrolled legislation on such subjects is exercisable by the several states.   They are subjects over which the states have delegated no power of *direct* legislation to the Government of the United States.   The streets within the limits of such towns are made and repaired at the charge of the respective towns, or of their inhabitants.   The transaction of local business in such streets may, to a greater or less extent, be regulated by local ordinances.   Internal regulations of police require especial adaptation to, and observance and enforcement in, the streets.   A street in a town is within the sover-

eign dominion of the state, but not as a part of its general public domain. It is a part of the special public domain, as to which no just government can legislate with a disregard of local rights and interests of inhabitants of the town.

The public streets of a muncipal town over which the mail may be carried in any of the routes established by Congress as post roads are, doubtless, post roads for the passage of the mail. Whether streets of such a town can be established by Congress as *post roads* for any other purpose is questionable. The question may not be one of constitutional power, but may concern only the constitutional head under which the power is exercisable. So far as the prohibition of private letter carrying within the limits of such a town may be concerned, the legislative power which is wanting under the head of *post roads* may, perhaps, be incidental to the execution of the power to establish *post offices*. If this be so, the point may be of little ultimate practical importance. But its present importance, from the particular language of the prohibitory and other enactments of the postal statutes in force, is not insignificant.

In some enactments of the postal statutes, the word *post office* designates—according to its primary meaning—a building, or apartment, in which the postal business of a mail station is transacted. Thus the Act of 2d July, 1836, § 36, requires every postmaster to reside in the city, or town, in which his office is situated, or in the district of country which it usually supplies. The word has also this meaning in the 17th and 6th Sections of the post-office act of 1825. These two sections contain the only prohibitory enactments by Congress, expressly securing the postal monopoly of the government, which have not already been cited. The 17th Section, repeating enactments of prior laws of the United States, which had been adopted from British statutes, provides that no vessel arriving at any port where a post office is established shall be permitted to report, enter, or break bulk, until all letters directed to any person or persons in the United States, or their territories, brought in her, under the care or control of her master or commander, shall have been delivered to the postmaster. The 6th

Section requires every master or manager of any steamboat, passing from one port or place to another port or place where a post office is established, to deliver all letters and packets addressed to, or destined for, such port, or place, to the postmaster there; and requires every person employed in any steamboat to deliver every letter and packet of letters entrusted to him, to her master or commander, before she shall touch at any port or place.

But, in postal statutes, the word post office frequently has another meaning. The postmasters are not, in any respect, carriers of the mail. (7 Cranch, 267; 8 Watts, 453; Cowp. 764.) The business of their offices includes many local arrangements in, and near, their stations, or districts, which Congress, in executing the power to establish them, has, necessarily, regulated. The word post office, as used in the statutes, therefore, frequently designates a mail station, or the postal district of such a station. The station may be a single detached house in which the post office is kept. A post office may be in a village, or in a municipal town, small or great. In the United States, a mere village is not, for postal purposes, usually distinguishable from such parts of the rural district in which it is situated as contain only detached houses. But, where the site of a post office is a municipal town, the whole space within its limits, beyond the walls of its post office, is usually included within the station; and is, for many postal purposes, distinguishable from exterior spaces. Adjacent built spaces may be included in the postal *district* of the town. If the corporate limits of the town embrace unbuilt spaces, they may be excluded from its postal district. But either the whole town, or its whole postal district, may be, and usually is, a single postal station. Some postal statutes, hereafter quoted, apply only to such sites of post offices as are incorporated under the name of cities. Other statutes apply to cities and other principal post towns. The principal post towns are distinguishable from those of secondary importance by a difference in the methods of appointing the postmasters. Under the act of 2d July, 1836, the President appoints them at places where the annual commissions

have amounted to $1,000. At other places they are appointed, under the act of 3d March, 1825, by the Postmaster-General. Thus New York, Philadelphia, and the other great cities, and all other municipal towns, whether cities or not, at which the respective postmasters are appointed by the President, may be classed as principal post towns. But the primary general division here, and in England, is into post towns and rural districts. The Supreme Court of the United States has used the word post town as including, in a general sense, all spaces other than those designated as rural. (1 Pet. 583; 2 Pet. 651.) The legal definition of a town accords with such a general use of the word post town. (Co. Litt. 115, 116.) Lord Mansfield, referring to the words, "any town or place," in an English postal statute, said that they were used because, at some stages, there was only a single house, but that the whole of a town was considered as one spot, and referred to a prior case, in which the Court had "considered the city of Gloucester as the post town or place in opposition to limits out of the town." (Cowp. 188.)

The constitutional power of Congress may, perhaps, as to some subjects which have been mentioned, be executed under the head of either post offices, or post roads, or partly under the one head, and partly under the other. But, of other subjects of the power this cannot be said. Under the head of *post roads,* the power seems to have been properly executed in designating highways for use in mail routes, and in protecting and regulating such use. Under the head of *post offices,* the power is properly executed by establishing mail stations, and regulating their postal business and its incidents.

According to this classification, a post for the carriage of letters on a mail route is distinguishable from a local post for their collection and carriage within the limits of a mail station. The former has been called a *general* post. (Cowp. 188.) Such a post has already been sufficiently described.

The local posts, of which, as yet, nothing has been said, are special arrangements of comparatively modern origin. Their establishment has been preceded, perhaps, everywhere, by the

employment of letter carriers for the local delivery of the con-
tents of mails. The business of such official carriers as thus
deliver letters received by mail may be combined with deliv-
eries of *drop letters.* These, in the language of the Act of 3d
March, 1845, § 1, are "letters placed in any post office not for
transmission by mail, but for delivery only." This twofold
official business of the carriers employed for the delivery of
letters received at post offices differs from that of official car-
riers employed in the special *collection and delivery* of letters
for a local post. The difference exists alike whether the re-
spective duties of the two employments are performed by dif-
ferent persons, or, in whole or in part, by the same carriers.
The business of letter carriers who deliver letters received at
post offices, including drop letters, will be first considered. The
special business of the official carriers of the public *local* posts
will, afterwards, be considered separately.

The business of a *general* post, consisting in the carriage of
letters and packets by mail, is completed by their delivery. In
England, a retention of them at the post office of destination
until they should be called for was not, in general, considered
a delivery. (3 Wils. 453; Cowp. 182.) In general, there-
fore, no compensation for delivering them elsewhere could be
charged as an addition to the statutory mail postage. Way
letters were, to some extent, collected and delivered by mail
carriers on post roads at point inconveniently distant from any
post town. This was probably done only in sparsely-peopled
rural districts, in order to obviate the necessity for increasing
the number of unproductive post offices. (See Stat. 9 An. c.
10, s. 33.) The persons to whom way letters were thus deliv-
ered paid no more than the statutory mail postage. (3 Wils.
450, 451.) When the post office of a station was a single de-
tached house in the country, the deliveries were made at it,
the letters remaining there until called for. (Cowp. 182, 189.)
This, probably, was the rule, or practice, at most, if not all, the
rural stations. But, in the post towns, including London, the
letters were deliverable, within the town limits, at the houses
of residence, or sojourn, or business, of the respective persons

to whom they were directed. They were thus deliverable in the town without any charge in addition to the mail postage. But, the letters directed to persons beyond the town limits were considered as deliverable at the post office. These letters might remain at the respective post offices, therefore, until called for. The postmasters, or letter carriers of the post offices, who extended their deliveries beyond the respective town limits, were thus at liberty to derive an emolument from this extension of the business. Persons beyond the town limits, who did not prefer calling at the post office, paid a compensation for the carriage of their letters in addition to the mail postage. English legislation of two centuries ago indicates that this extension of the letter-carrying business was then a source of actual or expected profit. The same legislation shows that a prohibition of private letter carrying within the limits of a post town was not then implied from an enactment forbidding the carriage of letters by a foot or horse post, but that, when the private carriage of letters within such a town was to be prevented, it was forbidden by a distinct prohibition.

The Post-Office Department in England was first permanently organized in 1656, by an ordinance for which the act of 1660, (12 Car. 2. c. 35,) passed at the restoration, was a substitute. Of the prior arrangements of the government with successive patentees and farmers of the posts, the last had been a contract made by the Council of State in 1653, confirmed by an ordinance of 1654, farming, for two years, the office of postmaster, foreign and inland, and prescribing regulations of the office. It ordained that the farmer should have the exclusive care and charge of the postage and carriage of all letters and packets, foreign and inland, from all persons, and in all places, of England, Scotland, and Ireland, and to and from all other places within the dominions of the commonwealth, that no person other than himself and his deputies should set up any post, or keep horses, or any packet boat, or boats, for the carrying or sending of letters, inland or foreign, and prohibited all posts, and carriers post, to or from any town or place within the commonwealth or its dominions not licensed by him

or his deputies. This ordinance did not prohibit private letter carrying otherwise than by post, but prohibited private posting as fully as the acts of Congress of 1825 and 1827. The ordinance of 1656 secured the monopoly to the Postmaster-General and his deputies by prohibitions which, though somewhat amplified in expression, did not, in effect, extend beyond those of the ordinance of 1654. But, the act of 1660 contained a twofold prohibition, forbidding private *letter carrying* as well as *private posting*. It enacted that no person other than the Postmaster-General, and his deputies, should *carry,* recarry, and deliver *letters* for hire, *or* set up or employ any *foot post, horse post, coach post, or packet boat* whatever, for the conveying or carrying of any letters or packets by sea or land, within the dominions of the Crown. It was provided that nothing in the act should be understood to prohibit the carrying or recarrying of any letters to or from any town or place to or from the next respective post road, or stage appointed for that purpose, but that every person should have free liberty to send and employ such persons for the purpose as he should think fit. Thus, all private letter carrying, not included in this and other particular exceptions, was prohibited. The contrast of the former ordinances, and this act of 1660, shows that though, by the latter, private letter carrying elsewhere than on mail routes was forbidden, it was not included in the phrase private posting, or understood to be forbidden by a prohibition of such posting. This was not less indicated in the post-office act of 1710, which supplied that of 1660. The modifications in the act of 1710 were especially consequent upon the establishment of local posts which had been introduced in the meantime.

The motive of extending the prohibition of private letter carrying by the act of 1660 must have been to secure to the official letter carriers of the post towns an emolument from their deliveries beyond the town limits. But as the villages became towns, and the population of the towns increased, the spaces within which the postmasters were compellable to deliver letters, without any charge, were extended. Their emoluments from the carriage of letters were thus diminished as their bur-

densome duties were increased. In the smaller post towns, which were about four-fifths of the whole number in the kingdom, the postmasters declined making deliveries, except at the respective post offices, without an additional allowance. (Cowp. 189, 186.) In 1768 it was decided that no postmaster could lawfully demand an additional payment for delivering letters at private houses in a post town. (4 Burr. 2149; 5 Burr. 2711, 2709.) But, the postmasters still insisted that the post offices were the only places at which they were bound by law to deliver letters, and that persons unwilling to make the extra payment could not require the deliveries to be made at the respective places of their abode. In this position, the postmasters appear to have been at one time sustained by the Postmaster-General. (5 Burr. 2710.) But the point was afterwards judicially decided in the Common Pleas in 1773, and King's Bench in 1774, against this opinion. (3 Wils. 443, Cowp. 182.) The decisions were that, in all post towns, the deliveries must be made, for the mail postage only, at the respective private residences of all persons whose residences were known or could be found. But the rule of decision was not applicable to letters for persons residing beyond the town limits. After these decisions, the course of business was to suffer letters for such persons to remain in the post offices until called for. (2 Smith, K. B., 404, 405.)

The general provisions of the English post-office acts of 1660 and 1710 were, in express terms, applicable to the colonies. While the act of 1660 (12 Car. 2, c. 35) was in force, the office of Postmaster-General for the colonies was created, and its administration aided by colonial legislation. The act of 1710 (9 An. c. 10) expressly authorized the establishment, with the approval of the English Postmaster-General, of a chief post office in each colony. This act was in force until the War of Independence. It was afterwards consulted by those who drew the earlier postal statutes of the United States, and was the source from which some provisions of acts now in force were derived. But local reasons rendered many of its regulations inapplicable in the colonies. Insuperable difficulties would

have prevented any general organization of a system of deliveries of letters in them except at post offices.

The Congress of the United Colonies, in July, 1775, appointed a Postmaster-General, under whose direction a line of posts was to be established with cross-posts. The articles of confederation of 1778 gave to Congress the sole and exclusive right and power of establishing and regulating *post offices from one state to another* throughout all the United States, and exacting such postage on the papers *passing through* the same as might be requisite to defray the expenses. The preamble and enactments of an ordinance of 18th October, 1782, regulating "the post office of the United States," indicate that the congress of the confederation defined its own legislative power for postal purposes "throughout all the United States," as if the article conferring it had not contained the words "from one state to another," or as if these words had not been of restrictive import. As mail routes within a state were essential to a postal communication between the states, the words could not have excluded the power of establishing such mail routes. This ordinance enacted that a continued communication of posts should be established under prescribed regulations, and that the Postmaster-General and his deputies, and no other person, should have the receiving, dispatching, sending post, carrying, and delivering of any letters, packets, or other despatches, from any place within the United States, for hire or profit, but that private cross-posts might, with the consent of the Postmaster-General or his deputy, be employed on any cross-road until a public rider could be established on it. The first Congress under the present Constitution enacted, in 1789, a law for "the temporary establishment of the post office," authorizing the appointment of a Postmaster-General, whose powers, and the regulation of the post office, were to be the same as they last had been under the resolutions and ordinances of the Congress under the former government. This law was annually renewed until 1792, when it was temporarily supplied by "an act to establish the post office and post roads within the United States," which was to remain in force for two years.

The latter act was altered and supplied on 8th May, 1794, by the first permanent post-office law of the United States. As the act of 1794 was also the first law of the United States which mentioned letter carriers at the sites of post offices, or drop letters, its prohibitory enactments which defined and secured the postal monopoly should be compared and contrasted with those of the previous temporary act of 1792. The law of 1792 (§ 14) made it penal for any person other than the Postmaster-General or his deputies, or persons by them employed, to take up, receive, order, dispatch, convey, carry, or deliver any letter or letters, packet or packets, other than newspapers, for hire or reward, or to be concerned in setting up any foot or horse post, wagon, or other carriage, by or in which any letter or packet should be carried for hire, or any established post road, or any packet or other vessel or boat, or any conveyance whatever, whereby the revenue of the General Post Office might be injured. The law of 1794 substituted for these prohibitions an enactment (§ 14) which only prohibited any person other than the Postmaster-General or his deputies, or persons by them employed, from being concerned in setting up or maintaining any foot or horse post, stage, wagon, or other stage carriage, on any established post road, or any packet, boat, or other vessel, to ply regularly from one place to another, between which a regular communication by water should be established by the United States, and from receiving any letter or packet other than newspapers, magazines, or pamphlets, and carrying the same by such foot or horse post, stage, wagon, or other stage, carriage, packet, boat, or vessel. The exception as to newspapers, etc., is no longer in force. In other respects, the prohibitions of this act of 1794 were the same as those in the acts of 1825 and 1827, now in force, which have been quoted.

The act of 1794 (§ 28) authorized the employment at such *post offices* as the Postmaster-General should direct of carriers for the delivery of letters at the *places* respectively where such post offices were established, except letters to persons who might, in writing, request them to be detained in the post office. The

act allowed a certain compensation to the carriers for the delivery of every letter received by post, and ascertained the postmaster's compensation for every drop letter. These enactments were repeated in the laws of 1799 and 1810, and, with a slight verbal alteration, in the act of 3d March, 1825, the provisions of which section, except that the letter carriers' compensation has been reduced, are now in force.

Thus, the business of the carriers who deliver letters received at the post office of a mail station is not regulated, in the United States, as it was in England at the date of their independence. But, notwithstanding the differences of the regulations in the two countries, the towns which include the respective districts of such letter carriers are, in the United States, for postal purposes, not less than in England, *single places*. We have seen that, in England, the business of such letter carriers in a post-town was not that of a distinct independent post. The differences of regulation in the United States do not bring this business, as a separate one, within the statutory definition of a carriage by *post*. If this had not already been shown, it would be proved by the description of a drop letter in the acts of 1794, 1799, 1810, and 1825. Such a letter is described in them as one "lodged at any post office *not* to be carried *by post,* but to be delivered at the place where it is so lodged." That carriage by post here meant carriage by *mail* appears from the language in which this definition of a drop letter was repeated in the passage already cited from the act of 1845.

No act of Congress, hitherto quoted, indicates, on the part of the government of the United States, a purpose to monopolize the local business of letter carrying in a post town. On the contrary, the omission in the act of 1794, and in the subsequent legislation, of every word used in any prior statute on either side of the Atlantic which could possibly have been thought applicable to such letter carrying, as distinguished from private letter carrying on mail routes, proves that Congress intended to prohibit the latter business only. The letter carriers of the post offices in towns would have had no motive to desire any prohibitory statute for their protection, if drop

letters had not been included in their deliveries.   Their superior facilities of access,. in the post offices, to the contents of the mails, would have secured the priority of their deliveries over those of private carriers calling there for letters.   Through this priority, the official carriers would have had a practical monopoly, so long as the service of a competent number of them was properly performed at reasonable rates of charge.

*Local posts* will next be considered.   These, as has already been observed, are special arrangements for the carriage of letters and packets to and from subordinate stations *within* the limits of a mail station.   Such special posts, private or public, become necessary when the buildings of a populous mail station cover an extensive space.   The business of such posts, when transacted by a government, is altogether independent of the reception or delivery of the contents of the mails.   A government which monopolizes the business of letter carrying in a populous post town, must establish such a system of postal stations within the town limits.   A government which does not monopolize the business within the town, may also, for the accommodation of its inhabitants, establish such a system of internal posts.   This may be done by an extension of the drop-letter system, through arrangements for a subsidiary collection, by postal officials, of letters and packets, at convenient points of reception or deposit within the town, beyond the walls of its post office.   When other offices are established for this purpose at any of the subordinate stations, they are called sub, or branch, post offices.   Though the primary receptacles of the letters are not *offices,* but mere appointed places of deposit, the local collection and carriage of the letters is a species of post.

The word post office, when used without any qualification, designates not a branch post office, but a post office at which mails arrive.   So, the word *post,* used without qualification, express or implied, signifies a general post, and not a mere local post within the limits of a mail station.   But the relation, or context, of the word post, may so qualify it as to show that a

special or local post is intended where no qualification is otherwise expressed.

In England, the type of such a post is the penny post of London. This post was first established while the above-quoted prohibitory enactments of the English post-office law of 1660 were in force. It originated in a private post established within the city, and the built suburbs, by letter carriers, whose business was conducted without the sanction of the post-office department. The prohibitory provisions of the act of 1660 enabled the department to suppress the business as a private enterprise. It was taken out of the hands of its projector into the management of the government; but he received a compensation from the government. A subsequent private undertaking of the same kind, called the half-penny post, was also suppressed by the government while the act of 1660 was in force. This act contained nothing which expressly sanctioned the charge by the government of a penny upon every letter and packet carried by this post. But, as no such service was prescribed by the act, the charge, when the service was performed, was, perhaps, not unlawful. The post-office law of 1710 contained enactments which indicate, however, that some doubt may have existed as to the lawfulness of this charge, and also some doubt of even the sufficiency of the prohibitions in the act of 1660, to prevent private letter carrying within the limits of a post town. The act of 1710, among the prescribed rates of postage, included one penny upon every letter and packet passing or repassing by the carriage called the *penny post,* established and settled within the cities of London and Westminster, and borough of Southwark, and parts adjacent, and to be received and delivered within ten miles from the general post office in London. This act prohibited all persons other than the Postmaster-General, or his deputies, from receiving, dispatching, conveying, carrying, recarrying, or delivering, any letters or packets, *or* making any *collection* of letters, *or* setting up, or employing any foot post, horse post, or packet boat, or other vessel or boat, or other person or persons, or conveyance, for the receiving, dispatching, conveying, carry-

ing, recarrying, or delivering, any letters or packets, by sea
or by land, or on any river within the dominions of the crown,
or by means whereof the same should be done. But nothing
in the act was to be understood to prohibit the carrying or
recarrying of any letters or packets to or from any town, or
place, to or from the next respective post road, or appointed
stage, *above six miles* from the general post office in London,
or the chief offices of Edinburgh and Dublin; and every person
was to have liberty to send and employ such persons for the
purpose as he should think fit; provided that nothing therein
contained should authorize any *collection* of letters to be made
in or near London, or the suburbs, under pretence of convey-
ing the same to any parts or places in the city, or suburbs, or
to the general post office of London, without the license of the
Postmaster-General. The limits of the business of the penny
post were enlarged in 1732 by the statute 4 G. 2. c. 33. This
act authorized the charge of an additional penny for deliveries
beyond the former limits. These former limits were after-
wards understood to include all such suburbs as had been cov-
ered with rows of contiguous buildings in 1710. (Cowp.
624.) The opinion which seems to have been afterwards en-
tertained was, that the Postmaster-General could not, without
further legislative authority, establish such a post in any other
town, on such a footing as to be secure against competition
with private letter carriers. This appears from a statute of
1765, (5 G. 3. c. 25, §§ 11 and 12,) which authorized him to
establish an office, to be called *The Penny Post Office,* in any
city or town, and the suburbs thereof, and places adjacent, in
Great Britain and Ireland, and the British dominions in Amer-
ica, and to demand and receive the same rates for the postage
of letters and packets conveyed by such penny posts as were,
or might be, taken for the carriage of letters and packets by
the penny post established in the cities of London and West-
minster, and borough of Southwark, and parts adjacent, ac-
cording to the extent and meaning of the acts of 1710 and 1732,
and of this act; and that, when such penny post office, or offices,
should be established, *no person should,* without the Postmas-

ter-General's license, *make any collection of letters or packets,* in or near such city, town, suburbs, or places where the same should be established.

If any measures, under this authority, were adopted by the British government before the Declaration of Independence, for the establishment of a penny post anywhere within the present limits of the United States, no such measure was carried permanently into execution.   The review of the English statutes on the subject has been thought necessary, because they are legislative precedents indicating that a mere authority to establish a penny post of the government in a town does not imply that, when it is established, private letter carrying in the town is prohibited.   They indicate also that something more than a general enactment forbidding . private posting is required in order to prohibit private letter carrying within the limits of a local post.

The first in date of the acts of Congress of the United States which expressly sanctioned the establishment of local public posts within the limits of mail stations was the act of 2d July, 1836.   This act, § 41, authorizes the Postmaster-General, whenever proper for the accommodation of the public in any *city,* to employ letter carriers for the delivery of letters received at the post office in the said city, except letters for persons who may, in writing, have requested them to be retained in the post office, *"and for the receipt of letters at such places in the said city as the Postmaster-General may direct, and for the deposit of the same in the post office."*   The provisions of this enactment concerning the employment of carriers of letters received at the post office were, in effect, a repetition of the provisions of the act of 1825 on that subject.   They must have been introduced in order to preclude any implication of an intention to change the prior system of delivery of such letters.   The only part of the act of 1836 which concerns the subject of present consideration was the authority to employ carriers for the primary receipt of letters at places other than the post offices of the respective cities.   Before arrangements of this kind were thus expressly authorized by this act, they had been, to some

extent, made by the postmasters at one or more cities. The second section of an act of 18th May, 1842, required the "postmasters at New York, Boston, Philadelphia, Baltimore, and New Orleans, and the other several cities of the Union" to account thereafter for all emoluments or sums received for boxes, or pigeon holes, or other receptacles for letters or papers, or for the delivery of letters or papers *at or from any place in either of the said cities other than the actual post office of such city*, and for all emoluments, receipts, and profits, from keeping *branch post offices* in either of the said cities. An act of 3d March, 1847, authorizes and directs the Postmaster-General to establish, when, in his judgment, the public interest or convenience requires it, one or more branch post offices, to facilitate the operations of the post office in any city or place which, in his opinion, may require such additional accommodation for the convenience of the inhabitants; and makes it his duty to prescribe regulations for such branch post offices, and provides that no additional postage shall be charged for the receipt or delivery of any letter or packet at any branch post office. A law of 3d March, 1851, § 10, enacts "that it shall be in the power of the Postmaster-General at all post offices where the postmasters are appointed by the President of the United States, to establish post routes *within* the cities or towns, to provide for conveying letters to the post office by establishing suitable and convenient places of deposit, and by employing carriers to receive and deposit them in the post office; and at all such offices it shall be in his power to cause letters to be delivered by suitable carriers to be appointed by him for that purpose." And an act of 15th June, 1860, has authorized the Postmaster-General to establish boxes for the delivery of letters at the outside stations in the suburbs of cities if it can be done without loss to the department or injury to the service.

Under the respective authorities conferred by the laws which have been mentioned, branch post offices have been established in the city of Philadelphia, and also boxes for the reception of letters and packets at other places in the streets of the city.

As the postal business within the station has been ·regulated, the letters and packets received in these branch offices, and in the boxes throughout the city, are collected and carried to the Philadelphia post office.

In the five enactments which have been quoted as authorizing or sanctioning the establishment of posts *within* the limits of mail stations, we find no prohibition of the business of private letter carriers within such limits.   Congress has, on the contrary, omitted to insert the prohibitions of which legislative precedents would have suggested the adoption, if it had been intended to forbid such business.   Of the five enactments, none except those of 1847 and 1851 apply to any mail station whose municipal character is not that of a *city.*   The act of 1847 applies to places not of this character so far as the words "any city or place" can thus determine its application.   But this act authorizes no specific arrangement of a local post except through subsidiary *post offices.*   We have seen that such offices are not the only primary receptacles of letters at the internal stations of such a post.   The act of 1851, which applies to every principal post town, whether a city or not, authorizes the establishment of a more extended and more complete system of local posts; and specifies the intended subjects of its arrangements in detail.   We have seen that a monopoly by the government of letter carrying, at the sites of the local posts, is not an essential part of such a system.

The *"post routes,"* which this tenth section of the act of 1851 authorizes the Postmaster-General to establish in the respective towns or cities, are thus *local posts* to and from interior subordinate stations of the cities or towns.   The definition of them is thus distinctly given in the act itself, which designates them as "post routes *wthin* the cities or towns."   If any other meaning of the word *post routes* was intended by the draftsman of the act, the latent intention is not expressed so that effect can be given to it.   The special *post routes* defined in the act are thus different from such mail routes, used by general posts, as are called, in a more general sense, *post routes.*   Unless the word "post route" is isolated, and its context and relation dis-

regarded, this general meaning is not attributable to it, as it is used in the act.

But, at the Post-Office Department, the general meaning has been attributed to it, and it has been considered synonymous with *post roads*. The Postmaster-General issued, on 17th July, 1860, an order, to take effect on 1st August, 1860, declaring that, under the authority conferred by the act of 1851, the streets and other public avenues in certain designated parts of the city of Philadelphia "are established as *post roads*."

*Post route* and *post road* are not properly synonymous even when applicable to the carriage of a mail to and from appointed *postal* stations. A *post route,* in this general sense of the word, is the appointed course, or prescribed line of transportation of the mail. *Post roads* are, as we have seen, the highways, or public passages, on which it is transported in such a route. In the postal statutes the words post route and post road have, therefore, sometimes, distinguishable meanings. Their meanings may be practically different. (See 9 Harris, 127.) Nevertheless, the distinction has not always been observed. The words post route and post road have, sometimes, in the postal statutes, the same signification. Of the instances in which this occurs, one, in particular, will be mentioned. The act of 7th July, 1838, § 2, contains the words: "Each and every railroad within the limits of the United States which now is, or hereafter may be, made and completed, shall be a *post route;* and the Postmaster-General shall cause the mail to be transported thereon, provided he can have it done upon reasonable terms," etc.; and the act of 25th July, 1839, provides that he shall not, under this authority, allow more than a certain rate of compensation to railroad companies for the conveyance of the mails "upon their roads." Here the railroads were to be used in the routes of general posts, to and from appointed mail stations. If *such* mail routes had likewise been the subject of the 10th Section of the act of 1851, the word *post routes,* as used in it, might have been understood as having likewise the meaning of *post roads*. But the interior local posts of a town, and not such general posts, are the subject of this enactment.

We think, therefore, that the word *post routes* is used in it in a special sense in which it is not synonymous with *post roads,* and that the latter word is, consequently, misapplied in the Postmaster-General's order.

The bill, after setting out this order, complains that the defendants, without the authority of the United States, have set up, and now continue, a foot post and a horse post for the conveyance of letters and packets over the streets and·other avenues in the parts of the city designated in the order, and are engaged in carrying and delivering such letters and packets for hire or compensation within these limits.   The defendants, having demurred to the bill, admit the truth of these allegations.   The argument for the United States is that the word post routes is, in the act of 1851, synonymous with post roads, that the Postmaster-General's order has, therefore, under the authority conferred by this act, made the streets in question post roads, and that, consequently, the act of 1827 prohibits the business of the defendants as that of carriers of letters and packets, by *post,* on such roads.

For the reasons which have been stated, we do not think that this interpretation of the act of 1851 can be sustained, or that the defendants are letter carriers by any *such* post as the act of 1827 prohibits.   We think that the act of 1827 applies only to private posts on mail routes, and that the act of 1851 does not apply to *such* routes.

The bill further complains, and the demurrer admits, that the defendants, without the authority of the United States, have established and now continue in use a private *express,* for the conveyance or transportation, for hire or compensation, of letters and packets, other than newspapers, pamphlets, magazines, and periodicals, by regular trips, and at stated periods or intervals, from various *places within* the city of Philadelphia to various other places in the city *within and between* the postal districts of the city, over the streets, avenues, and other highways of the city.   These allegations are copied from the 9th Section of the act of 1845, which has already been fully set forth.   "Cities, towns, or other *places*" are mentioned in it.

Upon these words the argument for the United States is, that private expresses between "places" *within* the postal district of a city or other town are prohibited. We have seen, that the purpose which induced this legislation of 1845 was to prohibit private expresses on *mail routes*. A legislative enactment may, however, extend beyond, as it may fall short of, the purpose of its draftsman. In its interpretation the question to be decided is, not what he may have intended, but what its words mean. The enactment now in question preceded the acts of 1847 and 1851—the latter of which was the first authority for the establishment of an extended system of local posts in towns. But the prior act of 1841 had recognized the existence of branch post offices in cities, and the act of 1836 had authorized the reception of letters, in cities, for the respective post offices at designated places beyond · their walls. Therefore, it is not impossible that Congress *might* have intended, in 1845, to prohibit private letter carrying within the limits of cities in which such internal posts are established. The question, consequently, may be considered as if the acts of 1847 and 1851 had preceded the act of 1845. This gives the utmost effect possible to the argument for the United States. But the argument, with all this aid, cannot be sustained. Where "cities, towns, or other *places*" are mentioned in the act, the word *places* designates mail stations which are neither cities nor towns. But no "places" other than mail stations are designated. Points within the limits of a mail station or postal district are not within the meaning of the word "places," as used in the act. In the statute already mentioned as having been quoted by Lord Mansfield, the word "place" in a similar context thus had the meaning of postal station. (Cowp. 188.) It has had a like meaning in other English and American acts of legislation, which have been mentioned. The word has had this precise meaning also in a judicial statement of the methods of giving notice of the dishonor of negotiable paper, personally or by post, "when the parties reside in the same city or *place*," and when the party to be served "resides in a different place or city." (11 Johns. 232.) In the act of Congress now in ques-

tion, the whole import of the context and the particular import and application of certain words which might be quoted and commented upon, thus define the word "places."

Thus, the business in which the defendants, as letter carriers, are engaged, is neither a private *post* within the meaning of the act of 1827, nor a private *express* within the act of 1845. The continuance of their business has a tendency to reduce the postal profits of the government or of its officials, by diminishing the number of letters received officially for local delivery. But this does not render the business unlawful, unless it is prohibited by the statutes which create or secure the postal monopoly of the government. The question is, not whether the business *could* constitutionally have been prevented or suppressed, but whether it *has* been legislatively prohibited. Though a local post, with subordinate stations, has been established in a post town, the statutes in force do not, in our opinion, prohibit the business of private letter carriers within the limits of the town.

Hitherto, the case has been considered as if the business of the defendants was confined to the carriage of such letters and packets as officials of the government could carry only on routes of the local post established within the limits of the Philadelphia mail station. If the business of the defendants, as described in the bill, were confined to the carriage of such letters, the demurrer, in its present form, would be sustained, and the bill dismissed. But, the bill contains other allegations. The Legislature of Pennsylvania, by an act of 2d February, 1854, incorporated newly the city of Philadelphia, with an enlargement of its boundaries, which now embrace the whole of the former county of Philadelphia, including extensive rural spaces beyond the limits of the former city and of the adjacent built districts. Within this enlarged municipality are many mail stations, every one of them having its post office, which is neither a sub nor a branch office. The built and rural districts of the city are intersected by streets which, so far as used between these offices by the general posts, are, of course, mail routes. The parts of the city designated in the Postmaster-

General's order include several of the mail stations and certain rural spaces. The bill, referring to the act of the state legislature incorporating the new city, names the several mail stations within its limits, and contains allegations importing that the defendants carry, not only such letters as have been specifically mentioned, but also letters which general posts of the government might carry on the streets in question, as established post roads between such mail stations. The defendants, if engaged in carrying letters or packets which might otherwise be thus carried by mail, violate the prohibition in the act of 1827. This prohibition is thus, however, independent altogether of the Postmaster-General's order of July, 1860, and of any act of Congress passed since 1827. So far as the bill may have this import, the demurrer cannot be sustained. A demurrer to so much of the bill as is not of this import would, however, have been sustainable. A demurrer thus framed would, perhaps, as may be inferred from the course of the argument, cover the whole intended subject of controversy. An application to amend the demurrer, or to take it off the file and demur again, may, therefore, be entertained. (See 2 Sch. & Lef. 207; 4 Madd. 192, 207, 208.) The case will stand over that the defendants may have an opportunity to make such an application.